822 June 30, 2016 No. 44

IN THE SUPREME COURT OF THE
STATE OF OREGON

DEPARTMENT OF REVENUE,
State of Oregon; and
Deschutes County Assessor,
*Appellants,*

*v.*

RIVER'S EDGE INVESTMENTS, LLC,
*Respondent.*

(TC 4962; SC S062829)

En Banc

On appeal from the Oregon Tax Court.*

Henry C. Breithaupt, Judge.

Argued and submitted January 14, 2016.

Marilyn J. Harbur, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant Department of Revenue. With her on the briefs were Ellen F. Rosenblum, Attorney General, and Daniel Paul, Assistant Attorney General.

Laurie E. Craghead, Deschutes County Assistant Legal Counsel, Bend, filed the brief for appellant Deschutes County Assessor.

Mark G. Reinecke, Bryant Lovlien & Jarvis PC, Bend, argued the cause and filed the brief for respondent. With him on the brief were Neil R. Bryant and Danielle Lordi.

BREWER, J.

The judgment of the Tax Court is affirmed. The supplemental judgment awarding attorney fees is vacated, and the matter is remanded to the Tax Court for further proceedings.

_____
* 21 OTR 469 (2014) (judgment); 22 OTR 46 (2015) (supplemental attorney fee judgment).

**BREWER, J.**

This is an appeal from a Tax Court decision involving the value of a convention center in Bend, Oregon, for property tax purposes for the 2008-09 tax year. The taxpayer who owns the convention center also owns a hotel across the street. The convention center and the hotel are held in different property tax accounts. Taxpayer's appraisal valued the convention center at $4,130,000, after applying two different approaches to valuation—the cost approach and the income approach (described in more detail below). The appraiser for the Deschutes County Assessor (assessor) and the Department of Revenue (department) appraised the convention center at $16,700,000, after applying only the cost approach to valuation. The Regular Division of the Tax Court rejected the department's appraisal for two independent reasons. First, the court held that Measure 50 (codified as Article XI, section 11, of the Oregon Constitution) and its enabling statutes required the property in each tax account to be valued separately. The court also independently concluded that the department's appraisal was unpersuasive because the appraiser lacked good reason for not having used the income approach. *Dept. of Rev. v. River's Edge Investments LLC*, 21 OTR 469 (2014). In a supplemental judgment, the Tax Court awarded taxpayer its attorney fees, concluding that the department's position was not objectively reasonable and that the department should be deterred from making similar arguments in the future. *Dept. of Rev. v. River's Edge Investments, LLC II*, 22 OTR 46, 48 (2015).

The department and the assessor have appealed to this court, raising a narrow range of issues.[1] As we explain, we affirm the Tax Court's decision to reject the department's appraisal on the ground that it was unpersuasive. Because that independent reason supports the Tax Court's decision,

---

[1] Both the department and the assessor appealed the decision on the merits, but the assessor's briefs merely join in the arguments made by the department. Accordingly, references in this opinion to the department's arguments on the merits should be understood to be arguments by the assessor as well. That understanding does not apply to the attorney fee award, however. The Tax Court awarded attorney fees only against the department, and only the department appealed that supplemental judgment.

we affirm its judgment, and we need not decide whether Measure 50 requires valuing the property in each property tax account separately. Because it was based in part on the Tax Court's Measure 50 analysis, we vacate the award of attorney fees and remand for further proceedings.

## I.  OVERVIEW OF LAW

Before turning to the facts of this case and the Tax Court's holding, it is useful to establish the legal context in which those issues arise: taxation of real property. We review the general principles and elaborate only on the details that are in play in this case.

### A.  *Real Market Value and Appraisal*

#### 1.  *Real market value*

The real market value of property is the starting point for determining the amount of property tax. *See* ORS 308.232 (unless property is exempt from ad valorem taxation, it should "be valued at 100 percent of its real market value").[2] "Real market value" is defined as essentially what a hypothetical buyer would pay to a hypothetical seller in an arm's length transaction. *See* ORS 308.205(1) (defining real market value);[3] *Hewlett-Packard Co. v. Benton County Assessor*, 357 Or 598, 602, 356 P3d 70 (2015).[4] The real market value is derived from the "highest and best use" of the property, because the highest sale price would come from a buyer who intended to use the property in the most profitable way.[5]

---

[2] Unless otherwise noted, all references to statutes or rules are to the versions in effect on the assessment date for this particular property: January 1, 2008.

[3] ORS 308.205(1) provides:

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

[4] *Hewlett-Packard Co.* dealt with industrial property and relied on different regulations. Nevertheless, the regulations applicable here show that the same general principles apply.

[5] "Highest and best use" means

"the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially

## 2.   *Maximum assessed value and Measure 50*

The real market value of property, however, is not necessarily the assessed value that goes on the tax roll. That qualification derives from Measure 50, a constitutional amendment enacted in 1997 (codified as Article XI, section 11, of the Oregon Constitution), and its enabling legislation. In sum, Measure 50 caps property taxes: The assessed value of the property will be the lesser of the real market value or what is called the "maximum assessed value." *See* Or Const, Art XI, § 11(1) (describing calculation of maximum assessed value);[6] ORS 308.146(2).[7] The maximum assessed value generally is designed to keep the assessed property value from increasing more than three percent per year. *See* Or Const, Art XI, § 11(1)(b); ORS 308.146(1).

For purposes of determining compliance with Measure 50, "property" means "[a]ll property included within a single property tax account[.]" ORS 308.142(1)(a). A property tax account is an administrative division of

---

feasible, and that results in the highest value. *See* The Appraisal of Real Estate, 12th edition (2001)."

OAR 150-308.205-(A)(1)(e). The "highest and best use" of real property is an integral part of determining its real market value. *See* OAR 150-308.205-(A)(2)(i):

"Determining highest and best use for the unit of property is necessary for establishing real market value. This determination of highest and best use may include, among others, all possible uses that might result from retaining, altering or ceasing the integrated nature of the unit of property."

[6] The relevant part of Article XI, section 11, provides:

"(1)(a) For the tax year beginning July 1, 1997, each unit of property in this state shall have a maximum assessed value for ad valorem property tax purposes that does not exceed the property's real market value for the tax year beginning July 1, 1995, reduced by 10 percent.

"(b) For tax years beginning after July 1, 1997, the property's maximum assessed value shall not increase by more than three percent from the previous tax year."

[7] ORS 308.146 provides in part:

"(1) The maximum assessed value of property shall equal 103 percent of the property's assessed value from the prior year or 100 percent of the property's maximum assessed value from the prior year, whichever is greater.

"(2) Except as provided in subsections (3) and (4) of this section, the assessed value of property to which this section applies shall equal the lesser of:

"(a) The property's maximum assessed value; or

"(b) The property's real market value."

property. ORS 308.142(2) (also for purposes of complying with Measure 50, the term "property tax account" means "the administrative division of property for purposes of listing on the assessment roll").

### 3. *Appraisal: cost, income, and comparable sales*

To determine the real market value of property, appraisers generally consider three different approaches to valuation: cost, income, and comparable sales. OAR 150-308.205-(A)(2)(a) (requiring the consideration of cost, income, or sales comparison approaches);[8] *Hewlett-Packard Co.*, 357 Or at 603. The cost approach estimates value from the cost that would be needed to construct a similar property; the income approach estimates value from the income that the property could be expected to generate; and the comparable sales approach estimates value from the prices paid for similar properties. *See id*.

An appraiser *must* consider all three approaches, even if the appraiser ultimately cannot use one or more of them in developing the appraisal. OAR 150-308.205-(A)(2)(a) (recognizing that some approaches cannot be applied to a particular property, but "each [approach] must be investigated for its merit"); *see Hewlett-Packard Co.*, 357 Or at 603. When an appraiser uses more than one approach, the resulting values suggested by each approach may not be identical. The appraiser then must reconcile those value indications into a single, final value. *Id.*; *see also* Appraisal Institute, *The Appraisal of Real Estate* 65 (12th ed 2001) ("The final analytical step in the valuation process is the reconciliation of the value indications derived into a single dollar figure or a range into which the value will most likely fall. The nature of reconciliation depends on the appraisal problem, the approaches that have been used, and the reliability of the value indications derived.").

---

[8] OAR 150-308.205-(A)(2)(a) provides:

"For the valuation of real property all three approaches—sales comparison approach, cost approach, and income approach—must be considered. For a particular property, it may be that all three approaches cannot be applied, however, each must be investigated for its merit in each specific appraisal."

4.   *Appraisal of especial property*

In some cases, a property has no immediate market value. In that circumstance, the real market value is determined based on just compensation. *See* ORS 308.205(2)(c) ("If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property."). The department has implemented that statute through its "especial property" rule, OAR 150-308.205-(A)(3). *See STC Submarine, Inc. v. Dept. of Rev.*, 320 Or 589, 595, 890 P2d 1370 (1995) (so noting). Under the especial property rule, an appraiser does not need to use the comparable sales approach, because there are no comparable sales. Instead, real market value is determined by estimating just compensation through the cost approach and/or the income approach. The rule provides:

> "Valuation of Especial Property: Especial property is property specially designed, equipped, and used for a specific operation or use that is beneficial to only one particular user. This may occur because the especial property is part of a larger total operation or because of the specific nature of the operation or use. In either case, the improvement's usefulness is designed without concern for marketability. Because a general market for the property does not exist, the property has no apparent immediate market value. Real market value must be determined by estimating just compensation for loss to the owner of the unit of property through either the cost or income approaches, whichever is applicable, or a combination of both."

OAR 150-308.205-(A)(3).

## II.   FACTS AND TAX COURT PROCEEDINGS

A.   *Facts*

As noted, the property at issue here is a convention center and related land in Bend. Taxpayer built the convention center south of its existing full-service hotel. The hotel and convention center properties are adjacent, but are in separate tax accounts. Taxpayer also owns other property in the neighborhood, including a golf course.

The department and the assessor filed a complaint in the Regular Division of the Tax Court challenging the real market value of the property as of January 1, 2008, for the 2008-09 tax year. The department and assessor asserted that the magistrate had erred in finding a real market value of $3,538,000 for the property, and asserted that the correct real market value was no less than $15,250,000.

At trial, each side presented an appraisal of the property. Neither of the appraisals used the comparable sales approach. *See River's Edge Investments LLC*, 21 OTR at 474 (noting that neither appraiser "developed a market indicator of value"). The department's appraiser concluded that the highest and best use of the property as improved was as a convention center "used in conjunction with" taxpayer's hotel. The department's appraiser used only the cost approach in valuing the property. He concluded that, as of January 1, 2008, the property should have been valued at $16,700,000.

The department's appraiser did not use an income approach. He concluded that the convention center property would increase hotel room rentals, and so the income from those extra hotel rentals should be counted in the income approach toward the real market value of the convention center. However, because taxpayer did not have information regarding the extra room rentals that derived from the convention center, the department's appraiser concluded that he could not use an income approach.[9]

The Tax Court later questioned the department's appraiser about his decision not to perform an income approach analysis. The appraiser explained that it would have been possible to value the hotel and convention center as a package and then apportion those values between the two properties. The court then asked why the appraiser had not employed that apportionment methodology in using an income approach analysis:

---

[9] The taxpayer provided its financial statements to the department's appraiser at the appraiser's request. There is no indication in the record that the department's appraiser asked the taxpayer to provide any further information that might have facilitated the use of an income approach or that the appraiser made any effort to estimate the extra room rentals derived from the convention center based on any other data.

"[THE COURT]:    We've got a problem with valuing just one parcel. We're all scratching our heads. We're worried that using just a focus on the convention center is lead—could be leading us astray. So maybe as a check, maybe as a valuation technique, and because you've done it elsewhere, you could value a package of two properties and then do an allocation. You said you could and you would have done it on the cost. Then you said, but I wouldn't have done it on the income. Why not?

"THE WITNESS:    I—

"[THE COURT]:    You had the information. You testified to that. Why didn't you do the exercise?

"THE WITNESS:    Why didn't I—okay. I didn't do the entire hotel and convention center. I didn't—

"[THE COURT]:    I know you didn't. My question is why didn't you?

"THE WITNESS:    Because I was—my understanding of the 308.205, especial use property, I didn't feel like the income approach was a proper approach.

"[THE COURT]:    Why? Other than a bald conclusion with no support, why? Just because you didn't feel that way, it won't do it for me.

"THE WITNESS:    Well, I—that's my thinking at the time. I can tell you now I wish I had. But that was my thinking at the time that this is especial use property and in order to—

"[THE COURT]:    But especial use property contemplates property that's part of a larger total operation; right?

"THE WITNESS:    That's correct.

"[THE COURT]:    More than one property perhaps.

"THE WITNESS:    Correct.

"[THE COURT]:    That's what we have here. And you've testified that in other circumstances, you started down that road and I told you to stop. But in other circumstances you've actually done that package and allocation process, haven't you?

"THE WITNESS:    Yes.

"[THE COURT]:   So the only reason you didn't do it here is because you didn't do it here?

"THE WITNESS:   That and just compensation, the portion that requires just compensation."

Taxpayer presented evidence of a substantially lower value. Taxpayer's appraiser began with a somewhat different highest and best use for the property: As a stand-alone convention center. Taxpayer's appraiser then used both cost and income approach analyses. His cost approach analysis was substantially similar to the one performed by the department's appraiser, suggesting a value of $15,460,000. The income approach analysis, however, suggested a much lower value: $4,130,000. Taxpayer presented expert testimony that the income approach represented the more accurate value.

B.   *Tax Court's Ruling on the Merits*

On the valuation issue, the Tax Court ultimately agreed with taxpayer. The Tax Court's opinion may be broadly broken down into two separate parts. In the first part, the Tax Court evaluated the department's appraisal and rejected it. *River's Edge Investments LLC*, 21 OTR at 472-77. In the second part, the Tax Court independently evaluated taxpayer's appraisal and concluded that it was reasonable. *Id*. at 477-78. In short, the Tax Court did not merely accept the taxpayer's appraisal by default.

Substantively, the Tax Court rejected the department's appraisal because it contained only a cost approach; it did not contain an income approach. *Id*. at 474-75. It was not merely the absence of an income approach that the court found critical, however. It was the appraiser's inability to offer a good explanation for failing to perform the income approach. *Id*. at 475. As noted, the department's appraiser had explained his decision not to use the income approach on the ground that he did not have information on hotel income that identified the extra income received by the hotel as a result of the convention center. *Id*. The Tax Court found that explanation problematic for several reasons. *Id*. at 475-76.

First, the Tax Court noted that Measure 50 caps maximum assessed value increases at three percent per

year, *see* ORS 308.146, and for purposes of complying with Measure 50, "property" means "'[a]ll property included within a single property tax account.' ORS 308.142(1)(a)." *River's Edge Investments LLC*, 21 OTR at 473. The Tax Court opined that those and other provisions of Measure 50 indicate that the value of property in a single property tax account must be determined without "reference to the [real market value] or any other characteristic of property in a different property tax account." *Id.* In so concluding, the court also relied in part on this court's decision in [*Flavorland Foods v. Washington County Assessor*](), 334 Or 562, 54 P3d 582 (2002), which discussed Measure 50, and which we briefly address below. *River's Edge Investments LLC*, 21 OTR at 473. Because Measure 50 would have precluded the department's appraiser from giving any consideration to the hotel's income (which involved property in a different tax account from the convention center), the court opined, the department's appraisal suffered from two problems: The appraiser's "conclusion that the highest and best use of the convention center was operation in conjunction with the hotel is simply inconsistent with the account focus of Measure 50," *id.* at 474, and the appraiser had no basis to insist that the income of the convention center should include any of the extra income received by the hotel. *Id.*;[10] *see also id.* at 475 (concluding that Measure 50 required that "the [real market value] of the convention center, and any other property in the same property tax account, must be determined independently of consideration of property (here the hotel) contained in another property tax account.").

Second, the court concluded that the department's appraisal was unpersuasive, even aside from any Measure 50

---

[10] The Tax Court explained:

"The department's expert therefore had no legal basis for taking into account, in the valuation of the convention center, what he considered to be augmented income at the hotel, produced by the presence of the convention center. That income could only be relevant to the value of the property in the tax account in which the hotel property was found. Further, his conclusion that the highest and best use of the convention center was operation in conjunction with the hotel is simply inconsistent with the account focus of Measure 50."

*Id.*

issue. According to the court, the decision of the department's appraiser not to perform an income approach analysis was "a serious departure from appraisal practice"—one that, "[i]f not adequately justified, \*\*\* would lead the court to place no reliance on the appraisal." *River's Edge Investments LLC*, 21 OTR at 474-75.

The court then explained why it rejected the appraiser's reason for concluding that the income approach required considering hotel income attributable to the convention center.[11] First, adding hotel income to convention center income would create a risk of double-counting that income toward the value of both properties. *Id*. at 475. While the convention center was expected to produce more revenue for the hotel, according to the court, the extra hotel income should be counted as hotel income, not convention center income. *Id*. Second, the appraiser's reasoning depended on it being legally significant that the taxpayer owned both the hotel and the convention center, when "the identity of an owner is not a factor that is taken into account in valuation of property." *Id*. at 476 (adding that nothing in the record showed that the convention center and hotel had to remain owned by the same party).

The Tax Court noted the emphasis that the department had placed on the especial property rule. The court questioned the relevance of the rule to the issues presented by this case: The rule provides only that the comparable sales approach is not used to value especial property, and neither party relied on the comparable sales approach in their appraisals. *Id*. at 474.[12] The Tax Court concluded that the department's appraiser had not offered a good reason for failing to use an income approach analysis, and his failure to do so was a departure from fundamental appraisal principles. *Id*. at 477. Accordingly, "the court place[d] no reliance on his conclusion of value." *Id*.

---

[11] Initially, the Tax Court reiterated its conclusion that counting hotel income toward the value of the convention center would violate Measure 50, *see id*. at 475, but that was not a separate and independent reason why the appraisal should be rejected.

[12] The Tax Court did not decide whether the subject property was especial property under the rule, nor does our analysis require us to make that determination.

To sum up the court's reasoning: the department had argued that it was entitled to assign income from some of the hotel rooms to the convention center to determine the value of the convention center using the income approach. The department was unable to do that, however, because the hotel's records did not show how much additional rental income for the hotel the convention center generated. The Tax Court's concern was twofold. First, the department's argument, if accepted, would lead to counting income from the same hotel rooms twice if it used the income approach to value both the hotel and the convention center. Second, if the department wanted to treat the two properties as a single unit, it would need to combine all the income from the two, determine the combined value, and then allocate the value between the two properties. The department could not do the former, and it had not done the latter.

The Tax Court explained, however, that its rejection of the department's appraisal did not necessarily mean that it should accept the taxpayer's appraisal by default. *Id*. at 477. The court therefore independently examined whether the taxpayer's proposed real market value was reasonable. *Id*. at 477-78. In doing so, the court agreed with taxpayer's appraiser that the income indicator was the better basis from which to determine value:

> "The property is an income producing property. It is in its early stages of operation and came onto the scene at one of the worst times in American economic history. The court considers the income indicator to be the most reliable indicator of value in this situation. The department has not established that the elements employed by the witness for taxpayer were unreasonable. Accordingly, the court accepts as reasonable the value conclusion of taxpayer's expert witness."

*Id*. Accordingly, the court found that the 2008-09 real market value for the subject property was $2,668,000.[13] *Id*.

---

[13] Taxpayer had included personal property in both its income approach analysis and the reconciled final value in its appraisal; the Tax Court deducted that amount in reaching its final valuation. *See id*. at 478 (noting that taxpayer's appraiser's value conclusion was "$2,668,000, which number did not include personal property").

C.  *Tax Court's Ruling on Attorney Fees*

Under ORS 305.490(4)(a)(A), the Tax Court may award attorney fees when it rules in favor of the taxpayer in an ad valorem property tax matter. (We discuss that statute in more detail later in this opinion.) Here, the Tax Court recognized that its exercise of discretion to award attorney fees was subject to the criteria of ORS 20.075. *See River's Edge Investments, LLC II*, 22 OTR at 47 (citing that statute) and, as explained below, the court addressed four of the statutory factors. The court ultimately entered a supplemental judgment that awarded the taxpayer attorney fees and costs against the department of $243,040.40.[14]

## III.  DISCUSSION

A.  *Standard of Review*

The department challenges the Tax Court's decision on the merits and its decision awarding attorney fees against the department. In both challenges, our standard of review is the same: We review the Tax Court's legal determinations for errors of law, and we review its factual findings for lack of substantial evidence in the record. *See* ORS 305.445 ("The scope of the review of either a decision or order of the tax court judge shall be limited to errors or questions of law or lack of substantial evidence in the record to support the tax court's decision or order.").

B.  *Assignments of Error on Merits*

As to the Tax Court's decision on the merits regarding the value of the convention center, the department asserts a narrow range of issues. Specifically, its assignments of error are as follows:

"The [T]ax [C]ourt misinterpreted the provisions of Measure 50, and the effect of those provisions on ORS 308.205, when it held that the highest and best use and real market value of property must be determined without reference to any property outside of the tax account under appeal."

---

[14] The Tax Court's fee award included fees that taxpayer had incurred before the Magistrate Division. The propriety of that aspect of the award has not been challenged on appeal.

"The [T]ax [C]ourt misinterpreted OAR 150-308.205-(A)(3) [the especial property rule] when it held that the department's cost approach should be given no weight because the department did not also perform an income approach to value the property."[15]

As a prudential matter, we begin with the department's arguments regarding the administrative rule on especial property, OAR 150-308.205-(A)(3), because it represents the narrowest possible ground on which we might resolve the case. *See* Wallace P. Carson, Jr., *"Last Things Last": A Methodological Approach to Legal Arguments in State Courts*, 19 Willamette L Rev 641, 643-45, 654 (1983) (advocating legal analysis in sequence beginning with administrative rules, then statutes, then state constitution, then federal law, then federal constitution). With respect to that issue, the department makes two arguments. The first is that the Tax Court erroneously concluded that the especial property rule required the department to *use* an income approach, when in fact the rule only required the department to *consider* an income approach. The second is that, even if the Tax Court correctly rejected the department's appraiser's reasons for declining to perform an income approach, the court still should have considered the department's cost approach.

We believe that the department's first argument misreads the Tax Court's opinion. The court recognized that the especial property rule requires an appraiser to consider the various approaches to valuation and that the department's

---

[15] The department raised four additional issues on the merits in two footnotes of its opening brief. In both footnotes, the department challenged the validity of the taxpayer's income approach analysis. The first footnote argued that taxpayer's appraisal should have given more weight to the cost approach, and that its valuation improperly relied on functional and economic obsolescence. The second footnote asserted that the taxpayer's income approach was incorrect because it did not include the income from the hotel, and because there was no "stabilized income history" for the property.

The department's arguments are not appropriate assignments of error. *See* ORAP 12.05(1) (rules regarding appeals generally also apply to direct appeals to Supreme Court). Because the department's additional arguments were not themselves presented as assignments of error, and because they are not implicitly contained within the assignments that the department did make, we do not consider them. *See* ORAP 5.45(1) (appellate courts do not consider assignments of error that are not presented in the opening brief).

appraiser had failed to develop an income approach. *River's Edge Investments LLC*, 21 OTR at 474 (appraiser "did not develop an income indicator"). It was the appraiser's lack of good reason for not using the income approach, however, that was critical to the court; it put into question the credibility of the appraisal. *Id*.

As we noted, the Tax Court first explained its general position:

> "[T]he department's expert witness did not develop an income indicator. That is a serious departure from appraisal practice. Appraisal Institute, *The Appraisal of Real Estate* 130 (13th ed 2008). *If not adequately justified, it would lead the court to place no reliance on the appraisal of the expert who took the departure.*"

*Id*. at 474-75 (emphasis added). The court then concluded that the appraiser's justification for not performing an income analysis was deficient:

> "The justification given by the appraiser for the department for this departure from standard practice was that the income information he had for the convention center did not include income augmentation experienced by the hotel by reason of the existence and operation of the convention center. *That explanation is deficient* for two reasons."

*Id*. at 475 (emphasis added). Because of the deficiencies (which the court discussed in detail), the court ultimately concluded that there had been

> "no reason to depart from fundamental appraisal principles or the consideration of the income method required by OAR 150-308.205-(A)(3). Because the expert witness for the department made such departures, the court places no reliance on his conclusion of value."

*Id*. at 477.

The department's argument that the Tax Court misinterpreted the especial property rule thus fails because it challenges a conclusion that the Tax Court never made. Contrary to the department's position, the Tax Court did not require all appraisals of especial property to use both a cost approach and an income approach. The Tax Court merely held that an appraisal's credibility is harmed when

the appraiser declines to use one of the two remaining approaches to valuation in the absence of a credible explanation. The department offers no argument as to why the Tax Court would have erred in concluding that that affected the credibility of the department's appraisal.

The department's second argument is that the Tax Court was required to consider the cost approach that its appraiser had performed, even if the court had correctly concluded that the department's appraiser also should have performed an income approach. According to the department, there is no authority under the especial property rule for the Tax Court to refuse to consider the department's cost approach. We do not find that argument persuasive.

The department's argument appears to assume that the mere existence of a cost approach analysis would have affected how the Tax Court determined the final value of the property. That assumption, however, is inconsistent with the reconciliation process in appraisals. A final value is not determined by averaging results from different methods, but by comparing the approaches used and their reliability in context. *See The Appraisal of Real Estate* at 597-98 ("The final value opinion does not simply represent the average of the different value indications derived. No mechanical formula is used to select one indication over the others, rather, final reconciliation relies on the proper application of appraisal techniques and the appraiser's judgment and experience."); *id*. at 65 ("The nature of reconciliation depends on the appraisal problem, the approaches that have been used, and the reliability of the value indications derived."). The department does not assert that the especial property rule—which provides that just compensation for especial property shall be estimated "through either the cost or income approaches, whichever is applicable, or a combination of both"—indicates otherwise.

In this case, the Tax Court explicitly found, when evaluating the taxpayer's appraisal, that the income approach was the more correct approach to valuation. *River's Edge Investments LLC*, 21 OTR at 478. The weight to be given to the various approaches is a question of fact, and evidence in the record supports the Tax Court's

determination. *See Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979) ("While, under the statute and rule, it is allowable for defendant to use only one approach in valuing property, whether in any given assessment one approach should be used exclusive of the others or is preferable to another or to a combination of approaches is a question of fact to be determined by the court upon the record."); *see also Brooks Resources Corp. v. Dept. of Revenue*, 286 Or 499, 505-06, 595 P2d 1358 (1979) (although income approach was "speculative," the finder of fact "may decide as a matter of fact that despite its inadequacies, the income approach is a better measure of value than the cost approach with respect to" the property at issue (emphasis omitted)). Because the Tax Court permissibly chose to accept the income approach valuation, the department's cost approach simply would not have affected the Tax Court's final valuation decision.

In sum: The Tax Court determined that the income approach—not the cost approach or a combination of the cost and income approaches—was applicable in this case. The department has not shown that the Tax Court erred in making that determination, either factually or legally. Because the Tax Court permissibly made that determination, the details of the department's cost approach would not affect the Tax Court's final conclusion on valuation. We thus find no merit in either of the department's arguments based on the especial property rule, OAR 150-308.205-(A)(3).

D.   *Measure 50*

The department's second assignment of error is that the Tax Court incorrectly interpreted Measure 50 to require that a property's highest and best use and its real market value be determined without reference to property outside the tax account at issue on appeal.

In order to assess the department's argument, we review in greater detail the Tax Court's holding regarding Measure 50. After explaining that Measure 50 required the assessed value to be the lesser of the maximum assessed value or the real market value, the court noted that ORS 308.146(2) required the comparison to be made using the

real market value and maximum assessed value of all property in a single property tax account:

> "Consistently with the constitution, the assessed value is the lesser of the [real market value] or the [maximum assessed value] for 'property.' ORS 308.146(2). For purposes of determining whether the [assessed value] of property exceeds the property's [maximum assessed value], 'property' means, except for centrally assessed property not relevant here, '[a]ll property included within a single property tax account.' ORS 308.142(1)(a)."

*River's Edge Investments LLC*, 21 OTR at 473 (final alteration in original).

Because the real market value for property in a tax account was compared to the maximum assessed value for property in the same account, according to the Tax Court, the real market value could not include value from property in another tax account. *Id*.[16] From that point, the Tax Court drew the additional conclusion that the real market value of property in one tax account must be determined without any reference to other property tax accounts. *Id*. The court stated that "[n]othing in the language of the constitution, the statutes or the *Flavorland* decision provides any support for determining the [real market value] of property in one property tax account by reference to the [real market value] or any other characteristic of property in a different property tax account." *River's Edge Investments LLC*, 21 OTR at 473.

As we understand the Tax Court's rationale, it drew from Measure 50 the idea that income from property in separate tax accounts should be treated separately and, for that reason, the department's efforts to attribute some hotel income (from one tax account) to the convention center (in

---

[16] The Tax Court explained:

> "The [assessed value] of any property can be determined only after comparing the [real market value] of the property and the [maximum assessed value] determined for the property. It therefore logically follows that the [real market value] of any property must be determined by reference to what the [real market value] of all property in a tax account is. Consideration of the [real market value] or [maximum assessed value] of property found in another tax account is, as a necessary conclusion, not permitted."

*Id*. at 473.

another tax account) were impermissible. As the court saw it, the notion of discrete tax accounts and the provisions of Measure 50 provided a simple way of separating one income-producing property from another.

The concern that we have with that rationale is that tax accounts are an administrative means of tracking property that may or may not reflect whether the property contained in one or more tax accounts is a single economic unit. *See* ORS 308.142(2) (for purposes of Measure 50, the term "property tax account" means "the administrative division of property for purposes of listing on the assessment roll"). Sometimes property comprising a single economic operation will be contained in multiple tax accounts and sometimes not. Measure 50 does not teach us one thing or another about that.

It is universally recognized that the location of real estate affects its value—so much so that the principle needs no citation. A convention center is worth more next to a hotel than to a factory; a gasoline station is worth more next to a freeway than to a rural road; a house is worth more next to a golf course than to a railway. The real market value of property thus will undisputedly be affected by *some* "characteristics of property in a different property tax account," even though the Tax Court seemingly thought otherwise. *See River's Edge Investments LLC*, 21 OTR at 473 (real market value is not to be determined "by reference to the [real market value] *or any other characteristic* of property in a different property tax account" (emphasis added)). Measure 50 does not exclude those sorts of characteristics from the valuation process.[17]

Neither does *Flavorland Foods* meaningfully inform our analysis. That case dealt only with the internal aspects of a single property tax account: Specifically, this court

_____

[17] It does not appear that the Tax Court found the common ownership of the two properties to be the characteristic forbidden by Measure 50. The court seems to have treated common ownership as a matter separate and apart from the constitutional question. *See River's Edge Investments LLC*, 21 OTR at 476 (court's statement that "the identity of an owner is not a factor that is taken into account in valuation of property" is not part of its Measure 50 discussion, but rather part of its explanation of the independent reasons why court rejected department's appraisal).

considered whether the phrase "each unit of property" in Measure 50 established a single maximum assessed value for all of the property in a tax account, or separate maximum assessed values for the land and the improvements. 334 Or at 567. When this court in *Flavorland Foods* stated that the voters intended Measure 50 "to refer to all the property in a property tax account," *id.* at 578, the court was only indicating that the property in a property tax account should be treated as a unified whole. The court did not address the relationship between property held in different property tax accounts or make any statement about how real property should be valued.

In short, there is no support in the pertinent statutes, this court's decisions, or in the evidentiary record in this case, for the proposition that the determination of what constitutes an economic unit (or the appropriate unit to value) for purposes of the income approach valuation corresponds to or is driven by the existence of separate tax accounts. Because there is no indication that tax accounts define an economic unit for the purposes of the income approach, the Tax Court's reliance on Measure 50 to support its rejection of the department's appraisal is of questionable validity.

We do not believe, however, that it is necessary for us to resolve the Measure 50 question in this case, because, as indicated, the Tax Court also found another independent and fully adequate reason for accepting the real market value proposed by taxpayer. The issue in this case is the real market value to be assigned to the property. In determining the property's value, the Tax Court had before it two appraisals. As discussed, the court concluded that the department's appraisal was not credible. The court's conclusion on that issue did not depend on its holding regarding Measure 50. *See River's Edge Investments LLC*, 21 OTR at 475 (explaining why appraiser's justification for not performing income approach was deficient; "even if Measure 50 did not compel separate consideration of the convention center and the hotel, basic valuation principles would"). The court then independently evaluated taxpayer's appraisal, concluded that it was reliable, and accepted taxpayer's valuation. *See*

*id*. at 477-78. Again, the court's decision to accept taxpayer's valuation did not depend on Measure 50.

Those conclusions support the result that the Tax Court reached. The court accepted the real market value of the only credible appraisal before it. The department has not successfully challenged any of those conclusions, and so we must affirm the judgment. Nothing that we could say about Measure 50 would change that.

E.   *Attorney Fees*

In addition to its arguments on the merits, the department also challenges the Tax Court's award of attorney fees to taxpayer. We turn now to that issue.

The Tax Court is authorized to award attorney fees when the court rules in favor of the taxpayer in an ad valorem property tax case. The relevant statute, ORS 305.490, provides in part:

> "(4)(a)   If, in any proceeding before the tax court judge involving ad valorem property taxation, exemptions, special assessments or omitted property, the court finds in favor of the taxpayer, the court may allow the taxpayer, in addition to costs and disbursements, the following:
>
> "(A)   Reasonable attorney fees for the proceeding under this subsection and for the prior proceeding in the matter, if any, before the magistrate[.]"

In reviewing an award of attorney fees under that statute, the ultimate question is whether the Tax Court abused its discretion. *See Clackamas Cty. Assessor v. Village at Main Street*, 352 Or 144, 151, 282 P3d 814 (2012) (so noting). The Tax Court's exercise of discretion is guided by the factors found in ORS 20.075(1). *Id.* at 153 ("[i]n determining whether to exercise its discretionary authority to award attorney fees under ORS 305.490(4)(a)(A), a court must consider the factors listed in ORS 20.075(1)").[18]

---

[18]   ORS 20.075 provides in part:

"(1) A court shall consider the following factors in determining whether to award attorney fees in any case in which an award of attorney fees is authorized by statute and in which the court has discretion to decide whether to award attorney fees:

In this case, the Tax Court relied on four statutory factors to conclude that it was appropriate to award attorney fees against the department: that the department's position was not objectively reasonable (ORS 20.075(1)(b)); that an award of attorney fees would deter the department from making meritless arguments (ORS 20.075(1)(d)); that the department had not objectively been reasonable or diligent in pursuing settlement (ORS 20.075(1)(f)); and that another unspecified factor (ORS 20.075(1)(h))—the importance of the Tax Court's Measure 50 determination—also justified an award. *River's Edge Investments, LLC II*, 22 OTR 47-49.

The department asserts that the award of fees was inappropriate because the department acted in good faith and presented objectively reasonable arguments to the Tax Court. The department's appraiser had a reasonable basis in fact and law, it asserts, for not using the income approach and instead relying on the cost approach. Taxpayer counters, consistently with the Tax Court's analysis, that the award of attorney fees was justified.

In light of our concerns about the Tax Court's holding with respect to Measure 50, we conclude that we should vacate the attorney fee award and remand to that court for further consideration. The Tax Court's conclusions about Measure 50 thread through most of the factors that the court identified in favor of an award of attorney fees. It was

---

"(a) The conduct of the parties in the transactions or occurrences that gave rise to the litigation, including any conduct of a party that was reckless, willful, malicious, in bad faith or illegal.

"(b) The objective reasonableness of the claims and defenses asserted by the parties.

"(c) The extent to which an award of an attorney fee in the case would deter others from asserting good faith claims or defenses in similar cases.

"(d) The extent to which an award of an attorney fee in the case would deter others from asserting meritless claims and defenses.

"(e) The objective reasonableness of the parties and the diligence of the parties and their attorneys during the proceedings.

"(f) The objective reasonableness of the parties and the diligence of the parties in pursuing settlement of the dispute.

"(g) The amount that the court has awarded as a prevailing party fee under ORS 20.190.

"(h) Such other factors as the court may consider appropriate under the circumstances of the case."

the only explicit "other factor" that the court found under ORS 20.075(1)(h)—the conclusion that a decision regarding Measure 50 resolved an important legal question that would benefit taxpayers, the department, and other county assessors. *Id.* at 49.[19] It underlies at least part of the court's conclusion that the department's position was not objectively reasonable. *See id.* at 48 (asserting that "Measure 50, as interpreted by the Oregon Supreme Court[,] makes such consideration of other tax accounts improper"). The Tax Court's conclusion regarding deterrence (ORS 20.075(1)(d)) depended on its conclusion that the department's position was not objectively reasonable, and so its deterrence analysis turned at least in some part on the Tax Court's Measure 50 holding. *River's Edge Investments, LLC II*, 22 OTR at 48. In short, of the factors identified by the Tax Court, most of them depended at least in part on its conclusions regarding Measure 50. Because the Measure 50 issue seemingly was raised by the Tax Court rather than the parties, it is difficult to say that the department had a position on Measure 50, much less a position that was unreasonable.

As noted, the decision to award attorney fees is a discretionary one, granted to the Tax Court. Our opinion here substantially affects the Tax Court's original basis for awarding fees. For that reason, we vacate the Tax Court's award of attorney fees and remand to that court. Because it is not clear whether the Tax Court will choose to award attorney fees on remand without regard to the Measure 50 issue, we do not at this time address the department's other challenges to the present attorney fee award.

## IV.  CONCLUSION

On the merits, because the otherwise-unchallenged credibility determination by the Tax Court adequately and independently supports its decision to accept taxpayer's

---

[19] We need not decide whether or under what circumstances it is appropriate for a court to treat the resolution of an important question of law as a factor supporting an award of attorney fees. We note, however, that such a consideration might be counterproductive. The threat of an attorney fee award could cause parties to settle important issues, even though the party's position might be supported by objectively reasonable arguments. And an opinion resolving an important issue of law may be valuable in itself, regardless of the merit of the particular arguments.

valuation, we affirm that part of the court's opinion on the merits and its judgment. Although we have concerns about it, we do not decide the merits of the Tax Court's conclusion that Measure 50 and its enabling statutes prohibit valuing a property tax account without reference to the characteristics of other property tax accounts. On the department's appeal from the supplemental judgment awarding attorney fees, the Tax Court's discretionary decision to award fees depended in part on its Measure 50 conclusion. We remand for the Tax Court to decide whether it should exercise its discretion to award attorney fees without regard to the Measure 50 issue.

The judgment of the Tax Court is affirmed. The supplemental judgment awarding attorney fees is vacated, and the matter is remanded to the Tax Court for further proceedings.